**CARMEL CENTRAL SCHOOL DISTRICT, Plaintiff,**

v.

**V.P., a student with a disability, by her parents, Mr. & Mrs. G.P., Defendants.**

**No. 04CIV.3320(CM)(LMS).**

United States District Court, S.D. New York.

June 9, 2005.

Leah L. Murphy, Leah Lennon Murphy, Kuntz, Spagnuolo, Scapoli & Schiro, P.C., Bedford Village, NY, for Plaintiff.

Rosalee Charpentier, Kingston, NY, for Defendants.

## DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

In this case, the Carmel Central School District seeks to overturn the decision of an Independent Hearing Officer (IHO) and a State Review Officer (SRO), both of whom concluded that the parents should receive tuition reimbursement pursuant to the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, for their unilateral placement of their daughter, V.P., at the private Kildonan School.

Two twists make this case different from other IDEA tuition reimbursement cases. First, prior to the time her parents enrolled her at Kildonan, V.P. had never attended public school or received any special education or related services from the Carmel Central School District (CCSD). Rather, she was home schooled for her entire life. At the point where her parents apparently decided they were no longer able to home school V.P., they unilaterally placed her in Kildonan, without giving her home school district the opportunity to evaluate whether a free appropriate public education (FAPE) could be provided for her in a public school setting.

Second, the school district in question at that time was not plaintiff CCSD. Rather,

it was the Yonkers Public School District (YPSD). After enrolling their daughter at Kildonan, the parents moved from Yonkers, where they had lived throughout V.P.'s educational life, to Carmel. They then demanded that the plaintiff pay for her private schooling.

Because IDEA and the regulations promulgated thereunder prohibit tuition reimbursement in these circumstances, I reverse the decision of the SRO awarding tuition reimbursement to the parents and direct that judgment be entered in favor of the District.

*Statement of Facts*

Plaintiff is a school district duly organized under the Education Laws of the State of New York. Defendants are the parents of V.P., born April 22, 1988.

Defendants moved into the District in April 2002, when V.P. was fourteen years old. Prior to moving to Carmel, defendants lived in Yonkers.

Throughout their years of residency in Yonkers, V.P. was home schooled by her mother. There is no evidence in the record that defendants complied with state law requirements to provide the home district with her individual home instruction plan (IHIP) for grades 1 through 4. Instead, defendants allowed V.P. to develop "at her own pace." They apparently did not begin reading instruction until the child was eight and one half years old. The parents did not notify the Yonkers Public School District about any concerns that V.P. might have a learning disability. Indeed, until defendants enrolled V.P. in the "Clonlara School"—a records clearing house for home schooled students—it appears that they did not provide YPSD with

any educational records concerning their daughter. And when they did begin providing YPSD with information, it was not accurate information. None of the reports that YPSD received from Clonlara indicated that the girl was making anything other than "age appropriate" progress in every subject. But she was not. She could not read. Had YPSD known about this, it would have raised the suspicion that V.P. had a disability and triggered a referral for a comprehensive evaluation. No such evaluation was ever made, either at YPSD's instigation or the parents' request.

In September 2001, while still resident in Yonkers, defendants unilaterally enrolled V.P. at the Kildonan School, a private, residential, non-approved school for learning disabled students. V.P. had not been classified by YPSD when she started at Kildonan, and she had never had any special education or related services from any public agency. At her parents' request, the girl did receive some evaluative testing from YPSD just before she started at Kildonan, but only such testing as was required for Kildonan's admissions process. She was not referred to Yonkers' Committee on Special Education (CSE) for a full evaluation and her parents did not request that YPSD provide her with special educational services.

Eight months after unilaterally enrolling their daughter in private school, defendants moved from Yonkers to Carmel. Although they arrived in their new school district in April 2002, they did not notify the CSE that they had a learning disabled daughter at that time. They finally referred the child to the District's CSE—the first time in her life she had ever been so referred—on August 8, 2002,[1] four months

---

1. The District's 56.1 Statement, ¶ 27, states that the parents contacted the CSE on August 8, 2002, but the SRO's decision, p. 2, states that the date was August 5, 2002. The discrepancy is due to the fact that the SRO used the date the parents sent the notification letter and the District uses the date it was stamped "Received" by the school. It is immaterial in any event. Defendants attempt to place notification three months earlier, in May 2002,

after they moved to Carmel and less than one month prior to the commencement of the new school year.

According to the SRO, the parents signed consent forms for the release of all of V.P.'s records from Yonkers and Kildonan. However, as noted by the IHO, those records were woefully incomplete, because V.P. had never been referred to Yonkers' CSE and YPSD had no indication that the child was in need of special education. (IHO Decision at 2; SRO Decision at 10.) What records the parents themselves provided also were incomplete. For example, the parents failed to provide Carmel with copies of an Occupational Therapy Evaluation from April 2000, a Progress Report by a Dr. Mary Eagleson dated March 22, 2001 or Progress Report by a Peggy S. Conner dated March 27, 2001. (Pl. Rule 56.1 Statement, ¶¶ 30, 31.)

Needless to say, between the lateness of notice to CCSD and the paucity of records on V.P., the CSE was unable to act on the parents' request for services prior to the start of the school year. So V.P. started the 2002–2003 school year at Kildonan. When the Carmel CSE met regarding V.P. on September 24, 2002, it quickly realized that additional and updated achievement testing would be needed before it could even begin to formulate an IEP for V.P. The testing took a month.

The CSE reconvened on October 29, 2002 and formulated an IEP that would have placed V.P. in the public school, with considerable support: two self-contained classes per day in reading and language arts, plus one period of Resource Room (5:1) per day, plus regular classes in math, social studies and sciences, albeit with special support and modifications. She was exempted from the foreign language requirement due to her reading deficiencies.

The special classes in reading and language arts used a multi-sensory approach, which was found to be especially appropriate to her learning style.

As noted above, the parents—who bore primary responsibility for the paucity of information about their daughter, due to their failure to provide YPSD with complete and accurate information over many years—withheld some of the scant information that they did have about V.P. In addition, the parents did not follow up or observe recommended programs or consider the IEP prepared for their daughter by the Carmel CSE. They were given the names and phone numbers of the relevant administrators at the Middle School so a schedule could be set up for their daughter, but they never contacted those administrators.

The District alleges that the reason the parents' participation in the CSE review process was minimal is that they had commenced the review procedure with one goal in mind: to obtain reimbursement for the cost of sending their daughter to Kildonan. Indeed, when asked by the District's social worker what she hoped to gain from the CSE process, Mrs. P. said, with becoming honesty, "Help with tuition." (Def. 56.1 Statement at ¶ 27 (citing statement of social worker L. Moreno's recollection of what Mrs. G. said to her on the phone, in Transcript of Proceedings before John Naun, IHO, June 6, 2003, p. 357:13).) The parents "deny accuracy of social worker's hearsay testimony." (Def. Reply to Pl. Rule 56.1 Statement at ¶ 20.)

*Prior Administrative Proceedings*

On April 4, 2003—well after the CSE recommended an IEP for V.P.—the parents demanded an impartial hearing for

---

but for reasons discussed more fully elsewhere in this opinion, their effort fails both

procedurally and on the merits.

the purpose of obtaining tuition reimbursement for Kildonan.

The IHO made the following findings after the hearing:

1. The IEP for the 2002–2003 school year devised by the District's CSE was not appropriate;
2. Placement in Kildonan was appropriate, but not in its residential program, only as a non-resident student;
3. The District was not obligated to reimburse the parents for their private testing;
4. The District was obligated to reimburse the parents for tuition for the day program at Kildonan, limited to the months of March, April, May and June 2003.

The District appealed. The SRO concluded that the District had failed to provide V.P. with a FAPE because it had recommended her for mainstream classes in math, social studies, and science. The SRO found as follows:

> The record shows that, due to the student's severe reading and writing disabilities, she required some form of a multi-sensory teaching approach be employed throughout her curriculum in order for her to be able to access the content of her courses and receive meaningful educational benefit from them; as such I find that the CSE erred by developing an IEP that failed to provide this or any other supplemental aids or services in three out of five of the student's core academic courses.

(SRO Decision at 6.) The SRO affirmed the IHO's finding that Kildonan's non-resident program was an appropriate placement for V.P. And he concluded that the parents were equitably entitled to reimbursement for their daughter's tuition be-

cause they had cooperated with the CSE's review of their daughter.

Neither the IHO nor the SRO addressed the District's argument that IDEA does not, as a matter of law, permit tuition reimbursement to the parents of a student who is placed in private school before she has ever received special education or related services from any public agency.

The District appeals to this Court, relying principally on this legal argument that was overlooked by both administrative reviewers. The District also argues that it was prepared to provide V.P. with a FAPE, and that even if it was not, the parents are not equitably entitled to tuition reimbursement, as they claim to be.[2] The defendant parents assert a counterclaim, alleging that the District is in contempt of the SRO's decision because it has not been funding V.P.'s placement at Kildonan. They also request additional relief for the District's "defiance" of the SRO's decision, which made Kildonan V.P.'s "stay-put" placement pending resolution of this litigation. (Answer and Counterclaim, dated June 19, 2004.)

*Standard of Review*

The SRO's decision is subject to independent judicial review. As the United States Supreme Court has cautioned, this "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities..." *Board of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Federal courts may not simply rubber stamp administrative decisions, but they must give "due weight" to the results of administrative proceedings, mindful that judges lack the specialized knowledge and experience required to resolve persistent and difficult

---

**2.** The parents make this argument in a letter brief from R. Charpentier to Hon. C. McMahon, dated March 4, 2005 (the "March 4, 2005 Letter").

questions of educational policy. *Walczak v. Florida Union Free School Dist.,* 142 F.3d 119, 129 (2d Cir.1998). Deference is particularly appropriate where the state hearing officer's review has been thorough and careful. *Id.*

■ By the same token, an SRO's determination of a pure question of law is not subject to deference. SROs have no specialized ability to construe statutes or administrative regulations; such is the ordinary province of the courts. Therefore, to the extent that the District argues that, as a matter of statutory construction, the defendants are not entitled to tuition reimbursement, this Court would not need to defer in any respect to the prior administrative determinations. However, since the administrative reviewers refused to address plaintiff's statutory argument, there is no ruling to which I could give deference, even if it were appropriate.

*Summary Judgment Standards*

Under Rule 56(c) of the Federal Rules of Civil Procedure, a court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir. 1987).

■ In this case, the defendant parents have failed to comply with Local Rule 56.1 which requires both parties on motions for summary judgment to submit numbered statements of fact, *each of which contains citations to the record to support the factual assertion made therein.* Defendants have filed a Rule 56.1 Statement, but it does not comport with the Local Rule. Of the twenty-six numbered paragraphs, fifteen do not contain citations to the record to support the allegations therein, as required by Local Rule 56.1(d). That is apparently because the record contains no support whatever for those factual assertions.

Plaintiff has called the Court's attention to several particularly egregious factual assertions for which defendants have included no record citation and for which the record contains not the slightest support. (*See* Pl. Reply Mem. of Law at 3–4.) For example, in Paragraph 8 of their Rule 56.1 Statement, defendants assert that they notified the Carmel CSE about their daughter on May 10, 2002. They cite nothing in the record to support that assertion, and (significantly) the SRO—who was certainly on the parents' side—found that they did not notify the Carmel CSE about V.P. until August 2002.

Although the defendants do not cite any evidence for this assertion, the Court, in an attempt to do justice to this child, has engaged in a thorough review of the record in an effort to find some support for this allegation. The hearing transcript reveals that there was contact, in the form of a telephone call from Mrs. P. to Katherine Rohe, a District administrator, on some unspecified date in the spring of 2002 (which roughly corresponds to the parents' asserted date of May 10, 2002). However, the record reveals that Mrs. P. did not tell Ms. Rohe that V.P. was learning disabled in that call, and did not request an evaluation or otherwise alert Ms. Rohe to the possibility that V.P. would be needing special services from CCSD in the fall. Ms. Rohe testified that Mrs. P. said something about V.P.'s being enrolled at Kildonan during this call. Because Mrs. Rohe was

aware that Kildonan "often serves student who have needs of some sort," she asked whether V.P. had been classified and/or tested and evaluated. (Tr. p. 167:6–19.) Mrs. P. replied that V.P. had been evaluated *but was not classified.* (Tr. p. 167:19 (emphasis added).) Ms. Rohe then asked how V.P. came to be at Kildonan, and Mrs. P. answered only that she and her husband had placed V.P. there while they still lived in Yonkers. (Tr. pp. 167:22–168:2.) Finally, Ms. Rohe testified that Mrs. P. requested bus transportation for V.P. to Kildonan during this call, which the District provided for "a week or two." (Tr. p. 168:7–16.) [3]

Ms. Rohe testified that this conversation lead her to believe that the parents' placement of V.P. at Kildonan was "their choice," and that V.P. "had been evaluated but she hadn't been classified and that the family had chosen to place her privately there ... I assumed that she had been referred for evaluation, had been tested and hadn't been classified." (Tr. p. 168:2–6, 170:6–8.) Most importantly, Ms. Rohe testified that, "My conversation with Mrs. P.... gave me *no information request, referral or reason to believe that anything should be pursued.*" (Tr. p. 190:23–191:2 (emphasis added).)

The record contains no evidence contradicting Ms. Rohe's recollection of this conversation. So assuming that I have located the correct portion of the record (something I can only guess at, in the absence of any citation from defendants' counsel), the only way this could constitute "notification" to the District would be if Ms. Rohe ought logically to have inferred that V.P. was eligible for special education services as a result of this call. Unfortunately for V.P. and her parents, the logical inference to be drawn

from Mrs. P.'s statement that her daughter had been "evaluated but not classified" is exactly the contrary. Indeed, the logical inference one draws from learning that a child was evaluated but not classified is that the parents thought their daughter was learning disabled but testing revealed that she was not. Because she was not classified, she was ineligible for IDEA's special education services, since only classified children are entitled to services or reimbursement from the public school district. *See, e.g., R.B. ex rel. L.B. v. Bd. of Educ. of the City of New York,* 99 F.Supp.2d 411, 413 (S.D.N.Y.2000) (citing 20 U.S.C. § 1414(d); N.Y. Educ. L. § 4402); *Corchado v. Bd. of Educ. Rochester City Sch. Dist.,* 86 F.Supp.2d 168, 173 (W.D.N.Y.2000). Of course, parents who believe their children to be learning disabled have been known to disagree with test results showing otherwise, and have also been known to place the child in private school in conformity with their beliefs. Thus the fact that V.P.'s parents had enrolled her at Kildonan did not necessarily imply that she was "learning disabled" in the sense of being a classifiable student under IDEA. In the context of the conversation, it meant only that V.P.'s parents had elected to place her in private school even though she was never classified.

So while Mrs. P. may have spoken to Ms. Rohe in the spring of 2002, there is absolutely no support for the contention that they "notified" the District about V.P.'s learning disabilities at that time. Indeed, from Ms. Rohe's account of the conversation, it appears that Mrs. P. actively concealed what she knew about V.P.'s very serious educational issues—i.e., that V.P. was severely dyslexic, could not read, and had never been evaluated for-

---

3. As discussed more fully *infra* (p. 21), a request for transportation assistance is not equivalent to disclosure of V.P.'s educational situation and did not serve to notify the District of her potential needs.

mally by any CSE—by leading Ms. Rohe to believe V.P. had been formally evaluated but not classified, and hence was not statutorily entitled to special services.

Similarly, at Paragraph 10 of Defendants' 56.1 Statement, they assert, without citing to the hearing transcript, that, "At hearing, the CSE administrator testified that regardless of her knowledge about the Kildonan School, she did not suspect that [V.P.] was a student with a disability. Because the parents' contacts were not reduced to writing at that time, she believed there was no obligation to further assist the family." Without any citation to the record, it is impossible to know exactly what testimony undergirds this claim. It appears to be a mischaracterization of Ms. Rohe's statement that she knew Kildonan served students "who have needs of some sort." [4] Assuming *arguendo* that this is the point defendants are trying to make, for the reasons just discussed, Ms. Rohe's conclusion that she did not suspect V.P. to be a special needs child, despite her attendance at Kildonan, was perfectly reasonable.

This Court has previously had problems with defendants' counsel, who has on other occasions been (to be charitable about it) careless in her citations (and mis-citations, and lack of citations) to the record. *See, e.g., Mackey v. Arlington Cent. Sch. Dist.,* No. 03 Civ. 5607(CM)(LMS), 2005 WL 1430472 (S.D.N.Y. March 9, 2005) (not yet published). In the past, I have excused counsel's carelessness (if that is what it is) with Rule 56.1 Statements by chalking it up to her busy solo practice. However, I am no longer willing to treat this lawyer differently than I treat other lawyers, or to refuse to enforce the rules of this Court, or to ignore what is fast becoming a serious issue of attorney credibility.

█ It is appropriate to deem admitted all facts in a movant's Rule 56.1 Statement that are not controverted by proper and compliant Rule 56.1 counter-statements. *See, e.g., Gubitosi v. Kapica,* 154 F.3d 30, 31 (2d Cir.1998); *see also Folkes v. New York Coll. of Osteopathic Med. of New York Inst. of Tech.,* 214 F.Supp.2d 273, 280–81 (E.D.N.Y.2002); *Alleva v. Dep't of the Treasury,* No. 99 Civ. 471(ERK), 2001 U.S. Dist. LEXIS 9963 at *1 n. 1 (E.D.N.Y. Mar. 16, 2001). All fifteen statements in the defendants' Rule 56.1 Statement that are not accompanied by citations to the record are stricken, and the corresponding facts in Plaintiff's Rule 56.1 Statement are deemed admitted.[5]

## IDEA Bars Tuition Reimbursement to Defendants

Plaintiff District argues that IDEA itself bars the plaintiffs' claim for tuition reimbursement. Although this precise question has not been decided by the Second Circuit, I conclude that the District is correct.

---

**4.** In conflict with this direct quotation of the transcript, *see supra* p. 9, Defendants' 56.1 Statement, ¶ 9 (without record citation), misleadingly paraphrases Ms. Rohe's testimony as indicating that she was "aware that Kildonan exclusively serves students with dyslexia."

**5.** Stricken from Defendants' 56.1 Statement for lack of citations or support are paragraphs 1, 7, 9, 10, 13–16 and 22–26. In addition, the first two sentences of paragraph 3 and the last two sentences of paragraph 8 are also stricken as unsupported by citation to the record. Plaintiff's paragraphs 1–50, supported by citations to the record, are deemed admitted. (Plaintiff's paragraphs 46, 49 and 50 do not contain citations *per se*, however they state only that appeals of the IHO and SRO decisions were taken and that the defendants served an answer to the complaint, all facts which are readily confirmed by reference to the docket in this case.)

20 U.S.C. § 1412(a)(10)(C) provides as follows:

**(C) Payment for education of children enrolled in private schools without consent of or referral by the public agency**

(i) In general

Subject to subparagraph (A), this subchapter does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.

(ii) Reimbursement for private school placement

If the parents of a child with a disability, *who previously received special education and related services under the authority of a public agency,* enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

(Emphasis added.)

Until the Supreme Court's decisions in *School Committee of the Town of Burlington v. Department of Education,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) and *Florence County School District Four et al., v. Carter,* 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993), it was uncertain whether parents could obtain private school tuition when a school district failed to provide a FAPE to a child with a disability. Even after the Supreme Court recognized the availability of the remedy, courts continued to struggle over its avail-

ability. *Burlington* itself recognized that parents could equitably disentitle themselves to tuition reimbursement. 471 U.S. at 373–74, 105 S.Ct. 1996. And numerous courts, including the United States Court of Appeals for the Second Circuit, have held that parents who fail or refuse to cooperate with the CSE in their school district—as, for example, by refusing to give the district a reasonable opportunity to evaluate their disabled child—forfeit their claim for tuition reimbursement. *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.,* 226 F.3d 60, 68 (2d Cir.2000).

In 1997, Congress amended IDEA to, *inter alia,* take into account the *Burlington/Carter* cases and clarify the amount of parental cooperation required before a parent would be entitled to tuition reimbursement. In particular, Congress added the above-quoted section to IDEA, and the Department of Education added concomitant new regulations to the IDEA regulations. 34 C.F.R. § 300.403 (quoting statute). Both the statute and the regulations state that tuition reimbursement is available only to parents of a child with a disability who enroll their child in private school without the district's consent after the child previously received special education and related services under the authority of a public agency.

The parties have not cited the Court to any Second Circuit decision discussing this aspect of the 1997 IDEA amendments. One of my colleagues recently addressed the issue, however, and he agreed with the school district. In *Board of Education of the City School District of the City of New York v. Tom F.,* No. 01 Civ. 6845(GBD), 2005 WL 22866 (S.D.N.Y. January 4, 2005), Judge Daniels denied parents private school tuition reimbursement on the basis that IDEA precludes reimbursement where the student has never before received special services from the public

schools. Tom F. had attended private school since kindergarten. On June 23, 1999 (it is not clear how old Tom F. was at the time or what year of school he would have been in), the parents contacted their CSE and requested a formal evaluation of their son to determine his appropriate educational placement. 2005 WL 22866 at *1. The evaluation lead to the creation of an IEP for Tom F. one month later, in July, recommending placement in the public school the following September. The parents rejected the IEP, unilaterally re-enrolled their son in the private school, and then requested an impartial hearing to seek reimbursement for the cost of tuition. The IHO awarded the parents tuition reimbursement, the district appealed, and the SRO affirmed the IHO on the ground that "the CSE was not validly constituted and, thus, resulted in an inappropriate placement." *Id.* On appeal from the SRO's decision, Judge Daniels interpreted the above-quoted IDEA amendments to preclude reimbursement for private school tuition where the student had never before received special services from the public school district. On that basis, he overturned the SRO's award.

At the Court of Appeals level, the First Circuit has written an instructive opinion in which they also agreed with the school district. In *Greenland School District v. Amy N.*, 358 F.3d 150 (1st Cir.2004), the parents had unilaterally enrolled their daughter (who was diagnosed with attention deficit hyperactivity disorder by a private psychologist) in a private school. Only after doing so did they raise the issue of their daughter's needing special education with the public school. The IHO awarded the parents tuition reimbursement for the private school placement, in part on the basis that the public school effectively had been providing the student with informal special education services all along. The district court reversed the IHO, however, and the First Circuit af-

firmed that reversal, concluding that the parents were not entitled to tuition reimbursement because they had never before raised the issue of special education when they unilaterally placed their daughter in private school.

The First Circuit began its decision as follows:

> In 1997 Congress significantly amended the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. § 1400 et seq. The 1997 Amendments, Pub.L. No. 105–17, 111 Stat. 37 (1997), reinforced the principle that children should not be removed unnecessarily from regular education environments, 20 U.S.C. § 1412(a)(5)(A), in part by eliminating "inappropriate financial incentives for referring children to special education." H.R. Rep. 105–95, at 90 (1997), *reprinted in* 1997 U.S.C.C.A.N.78, 87. One specific purpose of the amendments was to control government expenditures for students voluntarily placed in private schools by their parents.

*See id.* at 91–92. The Court of Appeals thus identified the problem sought to be addressed by the 1997 amendments as the referral of a child to a CSE for special education evaluation and services *after the parents had already made the unilateral decision to put the child in private school.* The First Circuit concluded that parents could not receive tuition reimbursement without at least giving districts notice that special education is an issue *before* deciding to place their child in private school. *Id.* at 159.

■ The very problem that the 1997 amendments sought to address at least suggests itself on the facts of this case. V.P. has never attended public school. She never received services from her public school district prior to the time that her parents unilaterally placed her in private school. There can be no question that the

parents voluntarily placed V.P. at Kildonan rather than even allow her to be evaluated by the YPSD during their years of residency in Yonkers. And indeed, if the P. family still lived in Yonkers, this would be an easy case. Under the literal language of IDEA and its regulations, the P.'s would not be entitled to tuition reimbursement, because they put their daughter in Kildonan before she received any services—including a CSE referral and evaluation—from YPSD.

The plaintiff District argues that the literal language of the statute and regulations equally forbids reimbursing V.P.'s parents for her private school tuition because, when she arrived in Carmel, she had already been placed in private school, without any prior experience of receiving special education services from any public agency. One could read the language of the statute in that way. However, I believe that the act of placing V.P. in private school that needs to be examined vis-a-vis Carmel is the act of re-enrolling the child at Kildonan for the 2002–2003 school year. The question, then, becomes whether the parents decided to re-enroll V.P. at Kildonan before she received any special education services from a public agency.

Attempting to answer an analogous (but not identical) question in *Greenland*, the First Circuit ruled:

> These threshold requirements are key to this case: tuition reimbursement is only available for children who have previously received "special education and related services" while in the public school

system (or perhaps those who at least timely requested such services *while the child is in public school* ).

*Id.* at 159–60 (emphasis added). The First Circuit added the parenthetical caveat (which is not reflected in the literal language of the 1997 amendment) because the amendment's legislative history suggested that Congress meant to include children who had requested special needs services during their period in the public schools but had not received them. This parenthetical is of little relevance here, because V.P. was never "in public school," either in Yonkers or in Carmel. More to the point, the First Circuit continued:

> These statutory provisions make clear Congress' intent that *before parents place their child in private school, they must at least give notice to the school that special education is at issue.* This serves the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a free appropriate public education can be provided in the public schools.

*Id.* at 160 (emphasis added). Thus, the First Circuit concluded that the amendment required parents to give the school district a realistic opportunity to decide whether the District could provide the child with a FAPE in the public school setting before placing their child in private school and seeking tuition reimbursement.[6]

---

**6.** This interpretation of the 1997 amendments would allow for the situation in which parents requested services for a student who had not yet received such services because she was too young to attend public school—the obvious example being a student who was eligible to begin kindergarten (the first year of public education in most school districts), and whose parents, prior to the commencement of the kindergarten year, requested that the child be classified and receive special education services. V.P. does not fall into that category. She was eligible to attend public schools for many years—seven or eight, by my count—before she was enrolled at Kildonan, and at no time during those years did her parents seek to have her fully evaluated, classified and provided with special education services in the Yonkers Public Schools.

The *Greenland* Court did note an ambiguity in the statutory language. While Subsection (ii) clearly limits tuition reimbursement to parents of children who had previously received special education services from some public agency, Subsection (i) says that districts must make a FAPE available to a child in order to avoid reimbursement. Subsection (i), read alone, suggests that the failure of a district to make a FAPE available to a student in the first instance would entitle the parents to reimbursement even if the child had not previously received services. However, the First Circuit concluded that Subsection (i) had to be read in conjunction with Subsection (ii), and that the latter section's clear bar against tuition reimbursement to parents who removed their children from public school before those children could be evaluated for and receive special educational services could not be read out of the statute.

The First Circuit's reading of the 1997 amendment accords with administrative interpretation of the statutory language. The regulations promulgated under IDEA after the amendment was passed, while generally restating the language of the amendment, are entitled, "Children with Disabilities enrolled by their parents in private school *when FAPE is at issue.*" (Emphasis added.) The use of this language underscores the Department of Education's understanding that parents had to "put FAPE at issue" by giving the school district an opportunity to evaluate a child and try to devise an appropriate public school program for her prior to placing the child in a private school.

There is no question that the parents never "put FAPE at issue" during their years in Yonkers. But they no longer live in Yonkers. They moved to Carmel during V.P.'s first year at Kildonan. The question I believe I must answer (although the parties do not put it squarely in these terms) is whether the parents fairly put FAPE at issue in Carmel before placing V.P. in Kildonan for her second year—not whether they put FAPE at issue when they put the child in Kildonan a year earlier, when they resided in Yonkers. Put into the language of *Greenland*, the issue comes down to whether the parents—before they removed their child from the public school by placing her at Kildonan for a second year—gave notice to the school that special education was at issue, and allowed the district to "assemble a team, evaluate the child, devise an appropriate plan, and determine whether a free appropriate public education can be provided in the public schools." *Greenland, supra,* at 160.

I concur with the SRO's finding that the parents did not seek an evaluation of their daughter from the Carmel CSE until shortly before the start of the 2002–2003 school year. If, by doing so, V.P.'s parents fairly placed her FAPE at issue prior to deciding to re-enroll her in Kildonan, then as long as the parents prevailed under the three part *Burlington* test (as the SRO found they did), they would be entitled to tuition reimbursement.

■ I have found no case presenting this precise fact pattern, and neither party has cited me to one.[7] However, after thoroughly reviewing the record, I conclude that the parents did not give Carmel's CSE a meaningful opportunity to consider whether V.P. could receive a FAPE before

---

7. As noted above, in *Tom F.,* Judge Daniels did not have occasion to discuss the issue that I find dispositive on that point—the parents' lack of cooperation with a new school district of residence—because the facts in his case differed in significant respects from the facts in this case. In particular, there was no issue of moving from one school district to another. So to that extent this opinion discusses an issue of first impression.

deciding to re-enroll her at Kildonan for the 2002–2003 school year. That being so, I hold that tuition reimbursement is not available to them as a matter of law, without regard to the *Burlington* factors. The only fair reading of the record in this case is that the parents never placed their child in the public school and never contemplated doing so. Rather, they enrolled their daughter in Kildonan for a second year without first giving the plaintiff District a realistic chance to evaluate V.P. and see if it could formulate a workable IEP that would allow the girl to be educated in the public schools.

At no point did the defendants evidence any intention to cooperate seriously with the formulation of a public school solution to the educational conundrum created by their years of neglect and obfuscation. This is evidenced by the following undisputed facts:

*First,* the defendants did not notify the CCSD about their daughter's potential needs—as the parents understood them—promptly when they moved to Carmel in April 2002. More precisely, they appear to have actually concealed V.P.'s disabilities (as they did in Yonkers), as well as their intention to seek help with tuition from the District, during the one phone call they placed to CCSD prior to August 2002, in which they indicated that V.P. had already been evaluated, was not classified, and was enrolled at Kildonan. The parents merely asked for transportation assistance during that call. And I have already explained why the mere mention of Kildonan in that conversation did not lead to any natural inference that V.P. was an IDEA classified student, and so why this request would not have put the district on notice about V.P.'s special education needs. The provision of transportation to Kildonan was not a "special service" within the meaning of IDEA; rather the District was acting pursuant to New York's Education

Law. *See* N.Y. Educ. L. § 3635(1)(b)(ii) (giving school districts discretion to provide transportation for students living within the district to private schools located more than 15 miles away, subject to certain restrictions).

Prompt, honest disclosure of V.P.'s educational background and needs would have allowed the District to begin evaluating the girl immediately. Since the CCSD was able to devise an IEP approximately 12 weeks after first learning of V.P.'s dyslexia and need for evaluation (via the letter from her parents in August 2002), timely notification of the District would certainly have led to the creation of an IEP by the end of the 2001–2002 school year. Defendants obviously recognize the importance of their belated notification, since they attempt to move that date back from August to May. But there is simply no getting around the fact that defendants notified the District about V.P. so late that it was literally impossible for the CSE to meet prior to the start of the new school year.

*Second,* because of defendants' prior lack of cooperation with, and even deception of, the YPSD, existing academic records concerning V.P. were insufficient to allow the Carmel CSE to evaluate the girl. The parents, who had provided inaccurate information to YPSD for many years, and who had made sure that YPSD never fully evaluated their daughter, were in a better position than plaintiff to know that additional testing would be needed before their daughter could be classified and before an IEP could be devised. Yet they deliberately chose not to allow the District time to complete a full evaluation of V.P. before re-enrolling her in Kildonan. Moreover, the parents did not even provide Carmel with all the records and tests that existed!

*Third,* during the formulation of V.P.'s IEP, the parents' ostensible "cooperation" was, to put it mildly, suspect. It was

certainly superficial and *pro forma.* Of particular importance, they refused to observe or familiarize themselves with the public school classes that the CSE thought might be appropriate for V.P., or to contact the administrators who would have been involved in working with the girl in the public school.

The only conclusion one can draw from this is that defendants never had the slightest intention of allowing the child to be educated in the public school, and did everything possible so that they could frustrate a timely review of V.P.'s condition before they re-enrolled her in Kildonan in September 2002. That being so, defendants did not give CCSD a realistic opportunity to provide the girl with a FAPE before they unilaterally placed her in private school for the 2002–2003 school year. And they certainly did not "put FAPE in issue" within the meaning of Congress by going through the motions of a CSE process while harboring not the slightest intention of doing anything other than keeping V.P. at Kildonan.

Defendants' attempt to distinguish *Tom F.* on its facts only strengthen this conclusion. Defendants argue that Tom F. was placed in private school "not for special education reasons and without first requesting testing for a disability by the public school," unlike V.P., whom they claim was referred to YPSD "for evaluation and Yonkers conducted an evaluation in 2000 that indeed concluded that she was educationally disabled." (March 4, 2005 Letter, p. 3.) But this contention has absolutely no support in the record. It is undisputed that V.P.'s parents never referred the girl to YPSD for a *full* CSE

evaluation before enrolling her at Kildonan; they *admit* they only authorized testing because testing was needed to satisfy Kildonan's admission requirements, and they only permitted administration of the tests that Kildonan required. (*See* Tr. at 789–90.) The obvious conclusion—that the P.'s had decided to send their child to Kildonan before they asked Yonkers to perform any testing—is inescapable.

Defendants' second suggestion—that Tom F.'s parents were somehow *more delinquent* than V.P.'s were—is ludicrous. Tom F.'s parents sought a comprehensive evaluation of their son in June, *three months* prior to the commencement of the school year, in contrast to V.P.'s parents who made a last-minute request for an evaluation from CCSD in August. And contrary to defendant's argument, it appears that Tom F.'s parents cooperated more fully with the CSE process—making a genuine effort to place the district on notice and giving it a realistic opportunity to develop an appropriate public school program for their child—than V.P.'s parents did. If the law bars tuition reimbursement to Tom F.'s parents, it certainly must bar reimbursement to V.P.'s.

V.P. never received special educational services from any public agency prior to August 8, 2002, when her parents first called her to the attention of CCSD. And when they notified CCSD about their daughter's condition, they had already decided to re-enroll her at Kildonan for the 2002–2003 school year. Under the 1997 amendments to IDEA, defendants are not entitled to tuition reimbursement.[8]

---

**8.** Because I have ruled that V.P. is not entitled to IDEA services as a matter of law—indeed, is precluded from receiving those services *as a matter of law*—the District cannot possibly be in contempt of the SRO's decision for refusing to pay her tuition to Kildonan from and after the date of that decision. Standard pendency analysis does not apply here, where the child is ineligible for services (including tuition reimbursement) *as a matter of law.*

*In the Alternative, the Parents Are Not Entitled to Reimbursement Because They Have Not Established That They Are Equitably Entitled to Reimbursement*

 There is an alternative reason to conclude that the defendant parents are not entitled to tuition reimbursement. The SRO concluded that the parents were entitled to prevail under standard *Burlington* analysis. But on the facts of this case, the parents have not sustained their burden of proving that equitable considerations favor their claim.

There are three separate prongs to the *Burlington* test. First, the school district must establish that it would have provided the child with a FAPE. Here, both the IHO and the SRO found that the CSE's IEP did not provide V.P. with a FAPE. I could quarrel with the administrators' finding in this regard—the District's arguments concerning what would be most educationally sound for V.P. at this point are persuasive. (*See* Pl. Mem. of Law in Reply to Def. Cross–Motion for Summary Judgment, dated Nov. 10, 2004 at pp. 5–9.). But for purposes of this motion I will assume (without deciding) that the IHO and SRO were correct in this finding.[9]

 Second, the parents must establish that the private school placement chosen by them was appropriate for their child. The IHO and SRO further found that Kildonan (albeit not its residential program) was an appropriate placement for V.P. I have absolutely no basis for overturning the administrators' ruling, since the District does not offer any evidence or argument on this point. Therefore, I assume that the parents have met their burden on the second prong of *Burlington*.

The third and final *Burlington* requirement is where I take issue with the SRO's conclusion. The third prong of Burlington requires the parents to demonstrate that the equities favor awarding them tuition reimbursement. As noted above, the Second Circuit has long held that parents who refuse to cooperate with their local CSE equitably forfeit their claim for tuition reimbursement. *M.C., supra,* 226 F.3d at 68. With this in mind, I turn to the issue of equitable entitlement. My conclusion on the issue of statutory interpretation foreshadows the result I reach here: the parents are not equitably entitled to tuition reimbursement.

The SRO concluded that the equities favored the parents because they had cooperated with the CSE. To support his conclusion, he identified the actions that he thought evidenced parental cooperation with the CSE process: (1) the parents informed the CSE that V.P. had been home schooled; (2) the parents signed consent forms releasing her records, including psychological evaluations from Yonkers and Kildonan, as well as a test performed by a private psychologist in May 2001; (3) the parents provided the CSE with a list of the tests V.P. had taken at Kildonan, which allowed the District to obtain the test results from Kildonan; and (4) the parents permitted the District to perform tests on their daughter. On the basis of these instances of "cooperation," the SRO concluded, "The parents consistently cooperated, communicated and worked with school staff in attempting to develop an appropriate program for their daughter, and ... therefore equitable considerations support an award of tuition reimbursement." (SRO Decision at 10–11.)

The SRO did not, however, address the numerous and highly significant factors—clearly and indisputably proven—that evidenced the parents' profound lack of coop-

---

9. Under *Walczak, supra,* 142 F.3d at 129, this is the sort of administrative finding that is entitled to a degree of deference from the Court.

eration with the evaluation process. He did not discuss the fact that the records whose release the parents authorized were woefully incomplete—and in the case of Yonkers, virtually non-existent—because of the parents' egregious misconduct and obfuscation over the first eight years of her "education." He specifically found that the parents failed to notify the Carmel CSE until there was but a month to go before the school year started, but failed to discuss the serious implications of defendants' failure to give the CCSD *timely* notification of the girl's potential needs when they arrived in the District many months earlier, or their obfuscation of her learning disabilities at that time. The SRO said nothing about the misleading information given by V.P.'s mother to the District several months earlier—information, as noted, that fairly implied that V.P. had been tested in Yonkers but found ineligible for services. He did not give any weight to the fact that additional, time-consuming testing before formulation of an IEP was inevitable because the girl's prior records and testing were so incomplete. The SRO did not even mention that V.P.'s parents refused to observe or consider public school alternatives to Kildonan or explore how her instruction would have been handled in the public school setting. Finally, the SRO did not address the fact that the parents' actions, as well as their statements and omissions (i.e., stating they wanted help with transportation in May of 2002 and help with tuition in August 2002, but failing to mention that V.P. was dyslexic during the earlier phone call), evidenced a clear intention not to allow V.P. to attend public school. Those factors not only outweigh the ostensibly "cooperative" parental actions identified by the SRO; they actually undermine the SRO's conclusion that the actions he cited constituted "cooperation" with the CSE process.

This Court has never reviewed a record in which the parents so obviously failed and refused to cooperate with the local school district's effort to devise a public school-based program for their child. If the behavior of V.P.'s parents does not equitably disentitle them to tuition reimbursement, then the third prong of the *Burlington* test is essentially meaningless.

Since the SRO failed to address significant equitable factors that decidedly do *not* favor Mr. and Mrs. P., his conclusion that the equities favor the parents carries little weight. I find that the parents have failed to sustain their burden of establishing that they are equitably entitled to tuition reimbursement.

*Conclusion*

For the above reasons, plaintiff Carmel Central School District's motion for summary judgment overturning the SRO's administrative decision is granted. The District should submit a form of judgment to the Court for its approval.