478 F.3d 494
 PORT WASHINGTON TEACHERS' ASSOCIATION, American Federation of Teachers, Local 2938, Nysut, AFL-CIO, Mary Anne Cariello, as President of the Port Washington Teachers' Association, and Michele Weiden, on behalf of themselves and the female students of the Port Washington Union Free School District, Plaintiffs-Appellants,
v.
BOARD OF EDUCATION OF THE PORT WASHINGTON UNION FREE SCHOOL DISTRICT, Laura Mogul, Nancy V. Cowles, Mark Marcellus, Dean Nardone, Roy Nelson, Robert Seiden, David Strom, as members of the Board of Education of the Port Washington Union Free School District and in their individual capacities and Dr. Geoffrey Gordon, as Superintendent of the Port Washington Union Free School District and in his individual capacity, Defendants-Appellees,
Society for Adolescent Medicine, New York State Society for Clinical Social Work, New York State Nurses Association, New York State Association of
School Nurses, Association of Reproductive Health Professionals and American Academy of Pediatrics, New York Chapter 2, Movants.
Docket No. 06-0708-CV.
 United States Court of Appeals, Second Circuit.
 Argued: December 14, 2006.
 Decided: February 27, 2007.
 
 Sherry B. Bokser (James R. Sandner and Antonio M. Cavallaro, of counsel), New York, NY, for Plaintiffs-Appellants.
 Florence Frazer, Ehrlich, Frazer & Feldman, Garden City, NY, for Defendants-Appellees.
 Galen Sherwin (Elisabeth Ryden Benjamin, New York Civil Liberties Union Foundation, and Julie Sternberg and Corinne Schiff, ACLU Foundation, of counsel), New York, NY, for Amici Curiae, American Academy of Pediatrics, New York Chapter 2, et al.
 Steven W. Fitschen (Douglas P. Henchen, The National Legal Foundation, of counsel), Virginia Beach, VA, for Amicus Curiae The National Legal Foundation.
 Before: SACK, SOTOMAYOR, and WESLEY, Circuit Judges.
 SACK, Circuit Judge.
 
 
 1
 On April 1, 2004, the plaintiffs, Port Washington Teachers' Association, American Federation of Teachers, Local 2938, New York State United Teachers, American Federation of Labor-Congress of Industrial Organizations ("PWTA"); Mary Anne Cariello, President of the PWTA; and Michele Weiden, the only social worker in the only high school (the "High School") in the Port Washington Union Free School District (the "District"), brought suit in the United States District Court for the Eastern District of New York on behalf of themselves and female students enrolled in the High School. They sought declaratory and injunctive relief against the Board of Education of the District (the "Board"), individual members of the Board, and Dr. Geoffrey N. Gordon, the superintendent of the District, individually and in their official capacities. The plaintiffs claimed that Dr. Gordon's policy memorandum telling District staff members of their obligation in some cases to report student pregnancies to the High School's principal, the superintendent, and the student's parents violated rights of students under the United States Constitution and state law and, if followed, would result in social workers breaking statutorily created rules regarding privileged communications. The district court (Thomas C. Platt, Judge) dismissed the action because the plaintiffs lacked standing, their claims were not ripe, and, in any event, their complaint failed to state a claim upon which relief can be granted.
 
 
 2
 The plaintiffs appeal. Because we conclude that they failed to establish that they suffered an injury in fact and that they therefore had standing to pursue this action, we affirm, without reaching the other bases for the district court's grant of the motion to dismiss.
 
 BACKGROUND
 
 3
 On November 12, 2002, the District superintendent, Dr. Gordon, issued a one-page memorandum (the "Policy Memorandum") explaining the District's policy regarding the reporting by staff members of student pregnancies. It "advise[s]" staff members that a student's communications to one of them that a student is pregnant "is not a communication protected by a legal privilege, but rather may trigger legal reporting obligations." Compl. Ex. A (Mem. Re: Reporting Student Pregnancy, Nov. 12, 2002). It states that a staff member who becomes aware of a student pregnancy should report it immediately to the school social worker. Then,
 
 
 4
 [t]he social worker should encourage the student to voluntarily disclose her pregnancy to her parents and, if the student represents that she will inform her parents, confirm that such a disclosure was made. If the student refuses to voluntarily inform her parents, the social worker should offer to meet with the parents and the student to help the student to inform her parents and/or offer to inform the student's parents without the student being present. If the student continues to insist on keeping the information from her parents, the social worker should inform the student that she/he will inform the parents. After consultation with the Principal and Superintendent, the social worker should inform the parents.
 
 
 5
 
 Id.
 
 
 
 6
 The Policy Memorandum further provides that where statutory rape or incest is suspected, the social worker should inform the principal and superintendent immediately "so that legally required reporting can be made to the appropriate authorities." Id. The Policy Memorandum forbids any member of the staff from informing any other person of a student's pregnancy, but it advises staff members to inform students that conversations about student pregnancies will not be held in confidence. Id.
 
 
 7
 On April 1, 2004, the plaintiffs brought this lawsuit, asserting five causes of action alleging violations of the United States Constitution under 42 U.S.C. § 1983, Title IX, and state law. They sought declaratory and injunctive relief.
 
 
 8
 On March 22, 2005, following an evidentiary hearing, the district court denied the plaintiffs' motion for a preliminary injunction on the grounds that the continued implementation of the Policy Memorandum presented no irreparable harm or "imminent danger." Port Washington Teachers' Ass'n v. Bd. of Educ. of the Port Washington Union Free Sch. Dist., 361 F.Supp.2d 69, 73, 81 (E.D.N.Y.2005).
 
 
 9
 On August 30, 2005, the defendants moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted, respectively. The district court granted the motion on three grounds. First, it concluded that the plaintiffs did not have standing to raise their claims. Port Washington Teachers' Ass'n v. Bd. of Educ. of the Port Washington Union Free Sch. Dist., 2006 WL 47447, at *3-*5, 2006 U.S. Dist. LEXIS 1904, at *9-*15 (E.D.N.Y. Jan. 4, 2006) ("Port Washington"). The plaintiffs had not shown that they had suffered or would suffer an injury in fact because they had failed to demonstrate "a realistic danger of any negative consequence flowing to [them] from the Policy [Memorandum]," in light of, inter alia, the fact that the policy established by the Policy Memorandum was not mandatory and "its application was discretionary." Id. at *4, 2006 U.S. Dist. LEXIS 1904, at *13-*14. Second, the court decided that the asserted claims were not ripe. Id. at *5, 2006 U.S. Dist. LEXIS 1904, at *13-*14, *17. Finally, and in the alternative, the court addressed and rejected the plaintiffs' substantive arguments on the merits.
 
 
 10
 The plaintiffs appeal.
 
 DISCUSSION
 I. Standard of Review
 
 11
 We review a district court's decision on a motion to dismiss de novo. In re Tamoxifen Citrate Antitrust Litig., 466 F.3d 187, 200 (2d Cir.2006). We accept as true the facts alleged in the complaint and draw inferences from the complaint in the light most favorable to the plaintiffs. Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc., 467 F.3d 283, 285 (2d Cir.2006).
 
 II. Standing
 
 12
 "[T]he irreducible constitutional minimum of standing contains three elements": (1) there must be an "`injury in fact,' — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) there must be "a causal connection between the injury and the conduct complained of;" and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and internal quotation marks omitted). Every plaintiff seeking to establish standing must prove these three elements, even where, as here, he or she asserts "third-party standing" — that is, he or she is attempting to resolve the rights of third parties who are not parties to the litigation but whose rights are likely to be "`diluted or adversely affected,'" Craig v. Boren, 429 U.S. 190, 195, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (quoting Griswold v. Connecticut, 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)), by the statute or rule being challenged. See Singleton v. Wulff, 428 U.S. 106, 112, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (applying the injury in fact requirement necessary to establish a case or controversy to the plaintiffs (doctors seeking Medicaid payments) even though they were asserting the constitutional rights of third parties (patients claiming that they had a constitutional right to the abortions)); Griswold, 381 U.S. at 481, 85 S.Ct. 1678 (concluding that plaintiff doctors' convictions on state criminal charges of disseminating birth control advice constituted injury to them sufficient to support standing for them to challenge the state statutes they had violated, even though they were asserting the constitutional rights of privacy of the persons to whom they had given the advice).
 
 
 13
 At issue here is the plaintiffs' ability to establish the requisite injury in fact, the first of the three constitutional elements. The plaintiffs assert that they can show such an injury in fact because complying with the Policy Memorandum requires social workers to "risk civil liability and place their licensure in jeopardy" for violating "their clients' constitutional and state statutory rights," while not complying with it requires all District staff to "face the threat of employer-initiated discipline and possible termination." Pls'. Br. at 12.
 
 
 14
 Having examined the Policy Memorandum, we agree with the district court that it poses no actual or imminent harm to the plaintiffs.
 
 
 15
 First, the plaintiffs offer little more than conclusory statements to support their assertion that social workers risk civil liability and their professional license by complying with the Policy Memorandum. While New York law provides that "a licensed master social worker or a licensed clinical social worker . . . shall not be required to disclose a communication made by a client," N.Y. C.P.L.R. § 4508(a), and a breach of the privilege of professional confidence is actionable as a tort, Doe v. Community Health Plan — Kaiser Corp., 268 A.D.2d 183, 187, 709 N.Y.S.2d 215, 218 (3d Dep't 2000), the plaintiffs have not shown that there is imminent danger either that they will disclose confidential communications to parents, the principal or the superintendent, or that Port Washington students will bring suit against the plaintiffs seeking redress for any such disclosure.[1] Indeed, the facts alleged in the complaint, see Compl. at ¶ 40, as well as the evidence the plaintiffs submitted, indicate to the contrary, that students have reacted to District staff members' compliance with the policy by refusing to disclose confidential information, see, e.g., Decl. of Michele Weiden, Apr. 1, 2004, ¶ 57, which would make it impossible for the plaintiffs then to disclose that information or for them to face civil liability or professional discipline for such disclosure.[2] Cf. 8 N.Y. Comp. Codes & Regs. § 29.1(b)(8) (defining professional misconduct as "revealing of personally identifiable facts, data or information obtained in a professional capacity without the prior consent of the patient or client, except as authorized or required by law"). Because the plaintiffs have not established that civil liability or professional discipline is actual or imminent, the theoretical possibility that either might occur in the future does not amount to injury in fact. See Lujan, 504 U.S. at 564, 112 S.Ct. 2130 (concluding that the plaintiffs' "`some day' intentions" without "even any specification of when the some day will be" were insufficiently concrete to satisfy the requirement that injury in fact be actual or imminent) (emphasis in original).
 
 
 16
 As for the plaintiffs' second argument, that they face discipline and termination if they fail to comply with the Policy Memorandum, because they have yet to violate it, they must demonstrate "`an actual and well-founded fear that [it] will be enforced against' [them]." Vt. Right to Life Comm., Inc. v. Sorrell, 221 F.3d 376, 382 (2d Cir. 2000) (quoting Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988)); see also Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 62, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (concluding that statutory threat of criminal liability created "a sufficiently direct threat of personal detriment" such that plaintiff-doctors who had yet to be charged had standing to challenge statutory provisions); Baur v. Veneman, 352 F.3d 625, 636 (2d Cir.2003) (stating that plaintiff alleging risk of future harm from consumption of downed cattle must "allege that he faces a direct risk of harm which rises above mere conjecture").
 
 
 17
 The district court correctly concluded that the plaintiffs "face no repercussions from the Policy [Memorandum]." Port Washington, 2006 WL 47447, at *4, 2006 U.S. Dist. LEXIS 1904, at *11. Dr. Gordon testified at the preliminary injunction hearing that the policy that the memorandum promulgated was not mandatory. He characterized it as "something we try to issue to clarify to help staff understand what procedures and what practices either have been in place or are now in place." Tr. of Nov. 8, 2004, at 214. He testified that he would not discipline a staff member for his or her actions with respect to parental pregnancy notification, but would view those actions as a matter of the staff member's exercise of professional judgment. See id. at 235. He said that he was not aware of any staff member having faced discipline as a result of having defied the policy. Id. at 219.
 
 
 18
 At oral argument before us, counsel for the defendants reiterated their position that violation of the Policy Memorandum pursuant to a District staff member's professional judgment would not result in discipline. Although neither counsel nor Dr. Gordon would unequivocally commit to adhere to this position irrespective of the circumstances, the fact that no such discipline has occurred, the defendants' representations that no such discipline is likely to occur, and the lack of evidence that there is such a likelihood support our conclusion that the discipline the plaintiffs fear is neither actual nor imminent.
 
 
 19
 The Policy Memorandum's legal status also reflects its non-mandatory character. New York's Education Law grants the power "[t]o establish . . . rules and regulations concerning the order and discipline of the schools, in the several departments thereof" to the Board of Education, N.Y. Educ. Law § 1709, not Dr. Gordon. He has no rule-making authority. See N.Y. Educ. Law § 1711. New York Education law gives him the power "[t]o enforce all provisions of law and all rules and regulations relating to the management of the schools and other educational, social and recreational activities under the direction of the board of education," id. (emphasis added), but not to promulgate or otherwise create rules, regulations, or policies of his own, see id. While it is not entirely clear from the record before us that the Board did not delegate its rule-making authority to Dr. Gordon, see N.Y. Educ. Law § 1709(33) (vesting the Board with "all the powers reasonably necessary to exercise powers granted expressly or by implication and to discharge duties imposed expressly or by implication by this chapter or other statutes"), or that the Policy Memorandum was not, in fact, a means of enforcing some aspect of New York law, the Policy Memorandum does not indicate such delegation or purport to clarify a particular Board rule or regulation, or an applicable statute. The Policy Memorandum does not identify case law upon which it may have been based. And none of the parties has identified the source of Dr. Gordon's authority to promulgate the Policy Memorandum as a binding set of rules.[3] Thus, as it has been presented to us, the Policy Memorandum is not within the superintendent's powers under section 1711, is not legally binding on the plaintiffs, and cannot be enforced against them.
 
 
 20
 The Policy Memorandum's language is not inconsistent with these conclusions. It repeatedly uses the word "should" in setting forth the notification procedures, thus easily supporting the understanding that adherence to them was not mandatory, by law or otherwise.
 
 
 21
 Finally, to establish their standing, the plaintiffs must demonstrate not only that they subjectively fear that Dr. Gordon would enforce the policy established by the Policy Memorandum against them, but that such fear is "well-founded." Vt. Right to Life Committee, 221 F.3d at 382. Assuming that they do labor under such a fear, for the foregoing reasons, we think that it is not "well-founded."
 
 
 22
 We conclude that the plaintiffs have failed to demonstrate actual or imminent harm to themselves and, therefore, have failed to establish the injury in fact necessary to achieve standing. The constitutional requirements for standing are grounded in Article III of the Constitution, which limits the jurisdiction of federal courts to cases or controversies. See U.S. Const. art III, § 2, cl. 1. "A hypothetical or abstract dispute does not present a case or controversy: The question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to justify judicial resolution." Marchi v. Bd. of Coop. Educ. Servs. of Albany, 173 F.3d 469, 478 (2d Cir.1999) (quoting Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)) (internal quotation marks and brackets omitted). The plaintiffs have failed to elicit facts that constitute such a controversy. Depending on the course of future events, the plaintiffs may one day be able to demonstrate such facts and establish standing, permitting them then to challenge the constitutionality or legality of the Policy Memorandum in a federal court. But they have not done so before us today.
 
 
 23
 Having decided that the plaintiffs lack standing, we need not and do not consider the other arguments that they make on this appeal. We note, similarly, that while the district court could not have known that we would affirm its judgment on the grounds that the plaintiffs are without standing, inasmuch as we agree with the court on that issue, the remaining portions of its opinion turn out to have been unnecessary to its decision and may therefore be characterized as dicta. See generally Church of Scientology of Cal. v. United States, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) ("It has long been settled that a federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." (citation and internal quotation marks omitted)); Westchester Day Sch. v. Village of Mamaroneck, 386 F.3d 183, 191 (2d Cir.2004) ("Prudence counsels against reaching out to establish a far-reaching constitutional rule when there are many other bases upon which this case may ultimately be decided.").
 
 CONCLUSION
 
 24
 For the foregoing reasons, we affirm the judgment of the district court on the ground that the plaintiffs lack standing to pursue this litigation at this time.
 
 
 
 Notes:
 
 
 [1]
 The plaintiffs themselves suggest, albeit elsewhere in their argument, that it is unlikely that students would bring suit. In arguing that they are effective advocates of the third-party students' rights and that there are "practical impediments" to the resolution of the violation of students' rights, the plaintiffs contend that "it defies logic that a student who does not want her parents informed of her pregnancy would have the wherewithal, intellectually, emotionally, or financially, to mount a legal challenge to the violation of her rights." Pls'. Br. at 16
 
 
 [2]
 The plaintiffs do not argue before us that the very possibility of breaching their ethical and legal duty to maintain students' confidentiality, rather than their potential exposure to civil liability and professional discipline, constitutes injury in factSee Pls'. Br. at 12; Lujan, 504 U.S. at 564 n. 2, 112 S.Ct. 2130 ("Where there is no actual harm . . . its imminence (though not its precise extent) must be established [by the plaintiff]."). In any event, such a possibility is as speculative as the possibility of suit or professional discipline.
 In addition, although the parties did not bring the decision in State of New York v. Heckler, 719 F.2d 1191 (2d Cir.1983), in which we concluded that a breach of confidentiality would constitute injury in fact, to our attention, we note that this case is distinguishable on several grounds from that one. Heckler involved a Department of Health and Human Services regulation that required physicians to notify a parent of a minor within ten days of providing prescription contraceptives to that minor. We concluded that physician-plaintiffs had standing to challenge the regulation because they faced "real and immediate injury by complying with the notification since they may thereby violate an ethical and legal duty to maintain confidentiality." Id. at 1195. The legal force and effect of the regulation at issue, the imminence of the harm imposed by the regulation and feared by the plaintiffs, and the nature of physicians', as opposed to school staff members', obligations of confidentiality, all distinguish Heckler from the case at bar.
 
 
 [3]
 The district court cites 8 N.Y.C.R.R. § 136.3(a)(2), which provides that it is the duty of the trustees and boards of education "to advise, in writing, the parent or guardian of each child in whom any aspect of the total school health service program indicates a defect, disability or other condition which may require professional attention with regard to health."See Port Washington, 2006 WL 47447, at *8, 2006 U.S. Dist. LEXIS 1904, at *24-*25. It might be argued (although no party has done so before us), that "health" encompasses pregnancy, and that the Policy Memorandum drew its authority from this regulation. This is not the case, however, as Rule 136.3, despite its broad language, apparently has a very limited scope. In Bello v. Board of Educ. of Frankfort-Schuyler Cent. Sch. Dist., 139 A.D.2d 945, 527 N.Y.S.2d 924 (4th Dep't 1988), the Appellate Division stated that Rule 136.3 applies only to those health tests required by the section of the Education Law under which the Rule was promulgated—in this case, section 904, which requires school districts to report the results of eye and hearing tests and tests for sickle cell anemia, see id. at 945-46, 527 N.Y.S.2d 924.