**S.W., Parent of Disabled Child M.W., Plaintiff,**

v.

**NEW YORK CITY DEPARTMENT OF EDUCATION, Defendant.**

**No. 07 Civ 9812(JGK).**

United States District Court, S.D. New York.

March 30, 2009.

---

## OPINION AND ORDER

JOHN G. KOELTL, District Judge.

The plaintiff, S.W. ("S.W."), brings this action on behalf of her son M.W. pursuant to the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, against the New York City Department of Education (the "DOE"). S.W. appeals the decision of the State Review Officer ("SRO") denying her claim for direct payment of her son's tuition to the Bay Ridge Preparatory School ("Bay Ridge"), a private school at which she unilaterally placed M.W. for the 2005–06 school year. The SRO's decision reversed the decision of an Impartial Hearing Officer ("IHO") which granted direct tuition payment to Bay Ridge. The parties have cross-moved for summary judgment. Amicus organizations Partnership for Children's Rights, Advocates for Children of New York, Inc., and New York Legal Assistance Group have moved for leave to file a memorandum of law *amicus curiae.* The Court grants that motion and has considered that brief and subsequent submissions. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(2)(A).

## I.

■ "Under the IDEA, states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education.' " *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir.2007) (quoting 20 U.S.C. § 1412(a)(1)(A)); *see also Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir.1998). A free appropriate public education ("FAPE") must provide "special education and related services tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.' " *Walczak*, 142 F.3d at 122 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (internal quotation marks and citation omitted)). Because the IDEA expresses a "strong preference for children with disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers, special education and related services must be provided in the least restrictive setting consistent with a child's needs." *Id.* (internal citation omitted); *see also Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir.2003).

These services are administered through a written individualized education program ("IEP"), which must be updated at least annually. *Walczak*, 142 F.3d at 122; *see also* 20 U.S.C. § 1414(d). In New York, the responsibility for developing an appropriate IEP for a child is assigned to a local Committee on Special Education ("CSE"). *Walczak*, 142 F.3d at 123.

■ Parents in New York who wish to challenge their child's IEP as insufficient under the IDEA may request an impartial due process hearing before an IHO appointed by the local board of education. *Id.* (citing 20 U.S.C. § 1415(f) and N.Y. Educ. Law § 4404(1)). A party may appeal the decision of the IHO to an SRO, and the SRO's decision may be challenged in either state or federal court. *Id.* (citing 20 U.S.C. § 1415(g), 1415(i)(2)(A) and N.Y. Educ. Law 4404(2)); *see also Jennifer D. v. New York City Dep't of Educ.*, 550 F.Supp.2d 420, 424 (S.D.N.Y.2008).

■ Under the IDEA, a district court independently reviews the administrative record, along with any additional evidence presented by the parties, and must determine by a preponderance of the evidence whether the IDEA's provisions have been met.[1] *Grim*, 346 F.3d at 380; *see also Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120 (2d Cir.1997). This independent review, however, is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034. The Court of Appeals for the Second Circuit has explained that "federal courts reviewing administrative decisions must give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.' " *Gagliardo*, 489 F.3d at 113 (quoting *Rowley*, 458 U.S. at 206, 208, 102 S.Ct.

---

1. Courts have noted that "summary judgment appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions," but that "[t]he inquiry ... is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." *Wall v. Mattituck–Cutchogue Sch. Dist.*, 945 F.Supp. 501, 508 (E.D.N.Y.1996); *see also Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F.Supp.2d 710, 714 (S.D.N.Y.2003).

3034); *see also Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir.2005).

■ Deference to the decision in the administrative record is particularly appropriate when the administrative officers' review has been thorough and careful, and when the Court's decision is based solely on the administrative record. *See Walczak*, 142 F.3d at 129; *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 367 (2d Cir.2006). Where the findings of the IHO and SRO conflict, the findings of the IHO "may be afforded diminished weight." *A.C. and M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir.2009) (quoting *Gagliardo*, 489 F.3d at 113 n. 2); *Jennifer D.*, 550 F.Supp.2d at 429. Accordingly, the Court " 'defer[s] to the final decision of the state authorities,' even where 'the reviewing authority disagrees with the hearing officer.' " *A.C.*, 553 F.3d at 165 (quoting *Karl ex rel. Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir.1984)).

## II.

The following facts and procedural background are taken from the administrative record.

S.W. is the parent of M.W. (Pl.'s 56.1 Statement ¶ 1; Def.'s Resp. to Pl.'s 56.1 Statement ("Def.'s 56.1 Resp.") ¶ 1.) M.W. was born in 1989 and, at the beginning of the 2005–2006 school year, was fifteen years old. (Pl.'s 56.1 Statement ¶ 1; Def.'s 56.1 Resp. ¶ 1.) He is classified as a student with a learning disability and is eligible for special education services under the IDEA. (Pl.'s 56.1 Statement ¶ 1; Def.'s 56.1 Resp. ¶ 1.) M.W. has been a special education student since kindergarten. (Aff. of S.W. ("S.W.Aff.") ¶ 2.) From kindergarten through fifth grade, M.W. attended P.S. 222, a public school. (Pl.'s 56.1 Statement ¶ 3; Def.'s 56.1 Resp. ¶ 3.) S.W. alleges that M.W. experienced learning difficulties and performed poorly in school while at P.S. 222. (Pl.'s 56.1 Statement ¶ 4.) He was held back in the first grade, although he was subsequently promoted through second, third, fourth, and fifth grade. (Pl.'s 56.1 Statement ¶ 4; Def.'s 56.1 Resp. ¶ 4.)

S.W. alleges that during M.W.'s fifth grade year, she realized that he was not learning in his special education class at P.S. 222. (S.W.Aff.¶ 10.) According to S.W., M.W. was barely reading and writing on the second grade level. (S.W.Aff.¶ 10.) After M.W. completed the fifth grade, S.W. rejected the DOE's proposed sixth grade placement in the special education program at P.S. 222 and unilaterally enrolled him in a special education program at Bay Ridge, a private school. (Pl.'s 56.1 Statement ¶¶ 2, 6; Def.'s 56.1 Resp. ¶¶ 2, 6.) Bay Ridge has not been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities. (Pl.'s 56.1 Statement ¶ 8; Def.'s 56.1 Resp. ¶ 8.) In 2001, M.W. began the sixth grade at Bay Ridge and continued to attend Bay Ridge through 2008. (Pl.'s 56.1 Statement ¶ 7; Def.'s 56.1 Resp. ¶ 7.)

S.W. alleges that when she first enrolled M.W. at Bay Ridge, in 2001, she was unable to pay his tuition. (Pl.'s 56.1 Statement ¶ 9.) S.W. alleges that she signed an enrollment contract with Bay Ridge with the understanding that she would be legally responsible for M.W.'s tuition if she were not ultimately successful in obtaining an order requiring the DOE to pay it. (S.W.Aff.¶¶ 15, 17.) She sought financial assistance from the DOE, and the DOE agreed to subsidize the cost of M.W.'s tuition for the 2001–2002 school year. (Pl.'s 56.1 Statement ¶¶ 9–10; Def.'s 56.1 Resp. ¶¶ 9–10.) For the 2002–2003, 2003–2004, and 2004–2005 school years, S.W. obtained payment from the DOE for M.W.'s tuition in a similar manner. In

each of those years, the DOE classified M.W. as learning disabled and recommended that he be placed in a special education class in a public school. (Pl.'s 56.1 Statement ¶ 11; Def.'s 56.1 Resp. ¶ 11.) In each of those years, S.W. challenged the DOE's proposed placements, and the DOE agreed to pay M.W.'s tuition costs. (Pl.'s 56.1 Statement ¶¶ 12–13; Def.'s 56.1 Resp. ¶¶ 12–13; S.W. Aff. ¶¶ 19, 20.)

In the 2005–2006 school year, however, S.W. did not succeed in obtaining payment for M.W.'s tuition from the DOE. On June 2, 2005, M.W.'s CSE held its annual meeting to develop his IEP for the 2005–2006 school year. The CSE meeting was attended by S.W., another parent member, a representative from the district, a school psychologist, a school social worker, and two teachers from Bay Ridge. (Def.'s 56.1 Statement ¶ 6; Pl.'s Resp. to Def.'s 56.1 Statement ("Pl.'s 56.1 Resp.") ¶ 1.) The IEP developed at the meeting classified M.W. as learning disabled and recommended that he be placed in a special class environment with a 15:1 student to staff ratio. (Ex. 1 at 1, 7.)

According to S.W., the meeting was not satisfactory. She alleges that the Bay Ridge teachers participated in the meeting for "less than ten minutes," and that the academic goals and objectives listed in the IEP were not developed at the meeting but were prepared by the attending school psychologist after the meeting. (Pl.'s 56.1 Statement ¶ 19.) She alleges that she and the two Bay Ridge teachers allegedly told the CSE at the meeting that they believed a 15:1 ratio was not appropriate for M.W.'s needs. (Pl.'s 56.1 Statement ¶¶ 16–17.) They also allegedly challenged the accuracy of the psycho-educational evaluation that M.W. received as part of his triennial reevaluation. (Pl.'s 56.1 Statement ¶ 18.) However, there is nothing in the record to indicate that S.W. told the CSE that she

would reject the proposed placement and enroll M.W. at Bay Ridge. On or about June 8, 2005, S.W. received a Final Notice of Recommendation indicating that the CSE had recommended that M.W. be placed in a 15:1 special education class at James Madison High School ("James Madison"). (Pl.'s 56.1 Statement ¶ 21; Def.'s 56.1 Resp. ¶ 21; Ex. 6.)

On August 15, 2005, S.W. signed a contract to enroll M.W. at Bay Ridge for the 2005–2006 school year. (Def.'s 56.1 Statement ¶ 10; Pl.'s 56.1 Resp. ¶ 1; Ex. B.) Item 1 of the contract lists the cost of tuition, $26,350. (Ex. B.) Item 2 states, in pertinent part:

> The Parent acknowledges that, in the event they have been offered a public school placement for their child, the Parent has chosen to reject said public school placement in favor of placing their child in Bay Ridge Preparatory School. Furthermore, the Parent acknowledges that, due to his/her financial status, he/she is dependent upon receiving prospective payment from the New York City Department of Education (the DOE) following an Impartial Hearing in order to make the payment of tuition
> . . . .

(Ex. B.) Item 4 provides:

> The Parent further acknowledges that the Bay Ridge Preparatory School has assumed the risk that the Parent may not receive prospective payment from the DOE or that said payment will be delayed beyond the term of the 2005–2006 school year. In consideration of Bay Ridge Preparatory's assumption of such a risk, the Parent agrees to cooperate fully in all efforts by his/her attorney and Bay Ridge Preparatory schools personnel to secure funding from the DOE for his/her child's placement at the Bay Ridge Preparatory School. The parent understands and agrees that, in the

event that the Parent does not co-operate fully in the process, Bay Ridge Preparatory School may elect, upon 30 days notice, to terminate the child's enrollment at the Bay Ridge Preparatory School.

(Ex. B.) At the bottom of the contract, the signature block states: "In the case of two parents both must sign," or, "[i]n the case of divorced parents the parent responsible for payments must sign." (Ex. B.) S.W. states that it has always been her understanding that the enrollment contract held her legally responsible for paying the tuition if the DOE did not provide payment. (S.W.Aff.¶ 17.)

On September 8, 2005, M.W. began classes in the tenth grade at Bay Ridge. (Pl.'s 56.1 Statement ¶ 25; Def.'s 56.1 Resp. ¶ 25; Ex. C.) In early October 2005, S.W. visited the CSE's proposed placement, James Madison, to visit a class and discuss the placement with a special education counselor. (Pl.'s 56.1 Statement ¶¶ 22, 26; Def.'s 56.1 Resp. ¶¶ 22, 26; Tr. 25–27.)[2] According to S.W., she informed her advocate in mid-October 2005 that she was rejecting the proposed placement at James Madison. (Def.'s 56.1 Statement ¶ 14; Pl.'s 56.1 Resp. ¶ 1; Tr. 54–55.) However, she did not at that time inform the CSE or the DOE of her decision to reject the proposed placement. (Def.'s 56.1 Statement ¶ 15; Pl.'s 56.1 Resp. ¶ 2; Tr. 54–56.)

In fact, S.W. did not give notice to the DOE that she had rejected the public school placement and had enrolled M.W. at Bay Ridge until the following January. By letter dated January 12, 2006, S.W.'s advocate wrote on her behalf to request an impartial hearing seeking direct tuition payment to Bay Ridge for the 2005–2006 school year. (Def.'s 56.1 Statement ¶ 16; Pl.'s 56.1 Resp. ¶ 1; Ex. I.) The letter notes that S.W. did not think that a 15:1 special education placement was appropriate for her son and that she had rejected the recommended placement at James Madison. (Ex. I.) An impartial hearing was held over multiple sessions, on July 19, 2006, September 14, 2006, and December 19, 2006. (Pl.'s 56.1 Statement ¶ 29; Def.'s 56.1 Resp. ¶ 29.)

On March 2, 2007, the IHO issued his Findings of Fact and Decision (the "IHO Decision") ordering the DOE to pay to Bay Ridge the cost of M.W.'s tuition for the 2005–2006 school year. (IHO Decision at 12.) The IHO found that the school district had failed to offer M.W. a FAPE because the CSE was improperly constituted and did not ensure that his IEP was based on accurate measures of M.W.'s aptitude. (IHO Decision at 6–7.) The IHO further found that the special education program at Bay Ridge was appropriate and capable of meeting M.W.'s needs. (IHO Decision at 8.) Finally, the IHO concluded that equitable considerations favored S.W.. (IHO Decision at 8–12.) However, the IHO did find that the enrollment contract relieved S.W. of liability for M.W.'s tuition, and noted that it was a matter of concern that S.W. was not asking for reimbursement, but rather for direct payment to the school. (IHO Decision at 8–12.) Ultimately, the IHO concluded:

---

**2.** At the hearing before the Impartial Hearing Officer, the plaintiff testified that she tried to get an appointment before October 2005, but that "it was impossible to get an appointment to view the classes before that." (Tr. 25.) The plaintiff testified that the school explained to her that it had just started and that they preferred for her to see "a smooth operation" rather than in the beginning of the school year. (Tr. 25–26.) The reasonable inference from this testimony is that the plaintiff first sought to visit James Madison at the beginning of the school year, in September 2005.

[I]t should be of little difference whether the local educational agency is required to reimburse a parent who had the wherewithal to initially pay tuition and thereafter seek reimbursement or to have the local educational agency be required to prospectively pay tuition to an educational facility which a parent cannot afford and without which a child would have no chance for the opportunity to receive an appropriate education. (IHO Decision at 11.) Accordingly, he ordered the DOE to pay the cost of M.W.'s tuition for the 2005–2006 school year directly to Bay Ridge. (IHO Decision at 12.)

The DOE appealed the decision to the SRO. S.W. cross-appealed that part of the IHO Decision finding that she did not take on any financial risk in placing her son at Bay Ridge for the 2005–2006 school year. In a decision dated July 5, 2007 (the "SRO Decision"), the SRO dismissed S.W.'s cross-appeal and sustained the DOE's appeal in part, thereby reversing the IHO's award of tuition payment to Bay Ridge. The SRO found "no reason to disturb" the IHO's decision that the school district had failed to offer M.W. a FAPE. (SRO Decision at 4.) The SRO also did not review the IHO's finding that Bay Ridge was an appropriate placement, noting that the DOE had not appealed that finding. (SRO Decision at 4.)

With respect to the IHO's last finding that the equities favored S.W., however, the SRO reversed the IHO's decision. The SRO found that S.W. had not given the DOE timely notice of her rejection of the district's placement and her intent to enroll her son in a private school. (SRO Decision at 4.) In the alternative, the SRO also found that the IHO had erred by awarding tuition costs directly to Bay Ridge. (SRO Decision at 5–6.) Although the SRO found that S.W. had standing to challenge the appropriateness of M.W.'s

IEP, he concurred in the IHO's interpretation of the contract as placing financial responsibility upon Bay Ridge and concluded that she had therefore not suffered any "out-of-pocket" loss. (SRO Decision at 5.) The SRO found that Bay Ridge had incurred a financial burden, but that S.W. could not assert a claim for relief on the school's behalf because it was a private entity that lacked standing to sue under the IDEA. (SRO Decision at 6.) On November 5, 2007, S.W. filed this appeal.

S.W. states under oath that she is currently indebted to Bay Ridge for the full tuition amount for the 2005–2006 school year. (S.W. Aff. ¶ 41.) She asserts that she sought a loan to pay M.W.'s tuition for the 2005–2006 school year from the Hebrew Free Loan Society which, according to S.W., provides interest-free loans to parents who have obtained a final decision from an IHO or have entered into settlements with the DOE. (S.W.Aff.¶ 42.) Because the SRO reversed the award of tuition costs, S.W. alleges that she was therefore unable to obtain a loan from them. (S.W.Aff.¶ 42.) She also asserts that Bay Ridge has never waived M.W.'s tuition costs for the 2005–2006 school year and has never awarded M.W. any scholarships to lessen his tuition costs. (S.W.Aff.¶¶ 43–44.)

### III.

In *School Committee of the Town of Burlington v. Department of Education,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), the Supreme Court held that parents who believe that their child's IEP fails to meet the requirements of the IDEA may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement of tuition from the state. *See id.* at 370, 105 S.Ct. 1996. This case differs from *Burlington,* however, in that S.W. requests retroactive

**356**

payment directly to Bay Ridge, rather than retroactive reimbursement to her.

**A.**

The initial question is whether S.W. has standing to assert a claim seeking the direct payment of M.W.'s 2005–2006 tuition to Bay Ridge. Article III of the Constitution of the United States limits the jurisdiction of federal courts to "Cases" and "Controversies." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To satisfy the requirements of Article III standing, a plaintiff must show that (1) she has suffered an actual or imminent injury in fact, which is concrete and particularized; (2) there is a causal connection between the injury and defendant's actions; and (3) it is likely that a favorable decision in the case will redress the injury. *Id.* at 560–61, 112 S.Ct. 2130. "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561, 112 S.Ct. 2130.

Because the judicial power of federal courts "exists only to redress or otherwise protect against injury to the complaining party," federal jurisdiction "can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action ....'" *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). Moreover, the requirement of standing "subsists through all stages of federal judicial proceedings, trial and appellate ...." *Spencer v. Kemna,* 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (quoting *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477–78, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)). "This means that, throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Lewis,* 494 U.S. at 477, 110 S.Ct. 1249).

The DOE argues that S.W. does not have standing to assert a claim for the cost of tuition because she has not paid and does not owe any money to Bay Ridge and therefore has not suffered an injury in fact. S.W. responds that she has standing based on two distinct injuries: the alleged debt she has incurred to Bay Ridge for the cost of her son's 2005–2006 tuition, and the DOE's failure to provide a FAPE to her son. The Court addresses these arguments in turn.

**1.**

First, S.W. asserts that she has suffered an injury in fact in that she is ultimately responsible under the 2005–2006 enrollment contract for paying to Bay Ridge the cost of M.W.'s tuition. Under her reading of the enrollment contract, it plainly and unambiguously holds her responsible for payment of the tuition. The DOE disputes this interpretation and argues that it plainly and unambiguously relieves her of any such obligation.

There is no dispute that New York law governs the interpretation of the enrollment contract. Under New York law, "[t]he threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous." *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59, 66 (2d Cir.2000). If a contract is unambiguous, a court is "required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 573 (2d Cir.1993); *see also Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir.1998). Contractual language "whose meaning is otherwise plain is not ambiguous merely because the parties

urge different interpretations in the litigation." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990). Where the contractual language is subject to more than one reasonable meaning and where extrinsic evidence of the parties' intent exists, the question of interpretation should be submitted to the trier of fact. *See Alexander & Alexander,* 136 F.3d at 86; *Consarc,* 996 F.2d at 573.

■■■■ The language of a contract is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Revson,* 221 F.3d at 66 (internal quotations omitted). Contract language is ambiguous when it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (quoting *Seiden Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992)).

In this case, the language of the enrollment contract is unambiguous, and it plainly relieved S.W. of responsibility for the cost of her son's tuition. Item 2 includes an acknowledgement by S.W. that she "is dependent upon receiving prospective payment from [the DOE] . . . in order to make the payment of tuition . . . ." This language contemplates that if S.W. does not receive prospective payment from the DOE, she will not be able to pay tuition, and Bay Ridge will not be paid. Item 4 provides explicitly that Bay Ridge "has assumed the risk that the Parent may not receive prospective payment from the DOE or that said payment will be delayed beyond the term of the 2005–2006 school year." The natural import of this language is that if S.W. did not receive prospective payment from the DOE, then Bay Ridge would not receive payment for tuition at all. This reading is consistent with other language in Item 4 which provides that the parent will fully cooperate with Bay Ridge to secure funding from the DOE "[i]n consideration of Bay Ridge Preparatory's assumption of such a risk."

S.W.'s desired interpretation strains the plain language of the contract past its limits. For example, S.W. relies heavily on the language above the signature block which says "the parent responsible for payments must sign." However, the first half of that sentence indicates that it applies "[i]n the case of divorced parents" and that it serves to identify the parent who has financial responsibility for the child rather than to impose responsibility for tuition payments upon the parent signing the contract. In the case of parents who are not divorced, the signature block does not even address the issue of responsibility for payment.

S.W. also attempts to inject ambiguity into the contract by pointing out that it refers only to prospective payment. S.W. would read this to mean that if the DOE did not provide prospective payment, then she would bear responsibility for paying tuition retroactively. However, this reading does not comport with the acknowledgement in Item 2 that S.W. cannot make tuition payments, nor with the other language in Item 4 which states that the penalty for non-cooperation could be the termination of the child's enrollment on 30 days' notice, not an effort to recoup the tuition payments from the parent. If S.W. were truly on the hook for tuition payments if the DOE refused prospective payment, it does not make immediate sense why Bay Ridge would threaten to terminate the child's enrollment if she were not to cooperate, rather than to seek reimbursement from the parent.

■ There is some evidence that S.W. attempted to obtain funds to pay Bay Ridge—she cites the fact that she sought a loan from the Hebrew Free Loan Society to make payment to Bay Ridge. She also asserts that she believed she was required to pay Bay Ridge. However, when a contract is unambiguous, the Court must give effect to its plain meaning and may not look to extrinsic evidence to interpret it. *Alexander & Alexander,* 136 F.3d at 86; *Consarc,* 996 F.2d at 573.

In sum, taking the enrollment contract as a whole, it is plain that the contract relieved S.W. of financial responsibility in the event that the DOE refused to pay her son's 2005–2006 tuition at Bay Ridge. This conclusion is further bolstered by the fact that both the IHO and SRO, both of whom are familiar with the customs, practices, and terminology of private schools and whose determinations are owed deference by this Court, also interpreted the enrollment contract to place ultimate financial responsibility solely on Bay Ridge. Therefore, S.W. does not have standing based on any financial indebtedness to Bay Ridge.

However, the fact that the enrollment contract relieved S.W. of financial responsibility does not end the inquiry. Even though S.W. has no financial obligation under the enrollment contract to pay Bay Ridge, she nonetheless has a continuing obligation under the contract "to cooperate fully in all efforts by his/her attorney and Bay Ridge Preparatory schools personnel to secure funding from the DOE for his/ her child's placement at the Bay Ridge Preparatory School," enforceable under threat of termination of M.W.'s enrollment upon 30 days notice. (Ex. B.) The Court of Appeals has held that "[i]njury in fact is a low threshold" and "may simply be the fear or anxiety of future harm," *Ross v. Bank of Am., N.A.,* 524 F.3d 217, 222 (2d Cir.2008) (internal quotations and citation

omitted), although the fear of future harm must be "actual and well-founded," *Port Washington Teachers' Assoc. v. Bd. of Educ. of the Port Washington Union Free Sch. Dist.,* 478 F.3d 494, 500 (2d Cir.2007).

The problem with this argument is that M.W. is now in college; thus, neither he nor his mother face any threat of harm from termination of his enrollment. While potential civil liability can constitute an injury in fact, it is the plaintiff's burden to demonstrate that the fear of such liability is "well-founded." *Id.* Here, S.W. has not submitted any evidence that Bay Ridge believes her to be responsible for tuition payment, nor that they would otherwise seek to hold her liable for noncompliance with the contract. Moreover, in the unlikely event that Bay Ridge sought payment from S.W., she could rely confidently on the terms of the contract pursuant to which Bay Ridge assumed the risk that the DOE would not pay the tuition.

**2.**

■ S.W. asserts as an alternative basis for standing her injury in fact based upon a violation of her right to have her son provided with a FAPE at public expense.

■ "Congress may create a statutory right the alleged violation of which constitutes injury in fact." *Heldman v. Sobol,* 962 F.2d 148, 154 (2d Cir.1992). The denial of a FAPE or of a procedural right created by the IDEA thus constitutes an injury sufficient to satisfy the standing requirement. *See id.* at 154–56 (denial of impartial due process hearing); *Fetto v. Sergi,* 181 F.Supp.2d 53, 66 n. 22 (D.Conn.2001) (denial of FAPE). A claim for the denial of a FAPE for a child can be pursued by the child's parent. *See Heldman,* 962 F.2d at 154–56. Therefore, as the SRO also concluded, S.W. has standing under the IDEA to seek a remedy for the DOE's failure to provide M.W. with a

FAPE. (SRO Decision at 5.) *See also* 20 U.S.C. § 1415(b)(6).

The DOE argues that S.W. nonetheless lacks standing to bring this action because the denial of a FAPE to her son cannot be redressed by the relief she seeks, namely, direct tuition payment to Bay Ridge. The DOE also argues that S.W. no longer has an injury because M.W. already received an appropriate education from Bay Ridge for the 2005–2006 school year. Both of these arguments are flawed.

■ For a plaintiff to have standing, it is true that the relief sought by the plaintiff must be likely to redress the plaintiff's alleged injury. *See Jenkins v. United States,* 386 F.3d 415, 418–19 (2d Cir.2004). However, the relief sought by S.W. does redress her injury. The IDEA requires school districts to provide disabled children with a FAPE, which is defined by the statute, in relevant part, as "special education and related services that ... have been provided at public expense ...." 20 U.S.C. § 1401(9). Here, it is undisputed that M.W. received an appropriate education at Bay Ridge during the 2005–2006 school year, but importantly, that education was not provided at public expense. If the Court orders the DOE to pay M.W.'s tuition to Bay Ridge, as S.W. requests, M.W. will have received a FAPE, that is, an appropriate education at public expense. Borrowing language from *Burlington,* this relief would redress S.W.'s injury by requiring the DOE "to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." 471 U.S. at 370–71, 105 S.Ct. 1996. Moreover, unlike in *Jenkins,* where the relief sought would not have ended the controversy in that case, the entry of an order directing the DOE to pay Bay Ridge would resolve S.W.'s dispute with the DOE. This plainly meets the requirements of redressability.

The DOE's reliance on *Emery v. Roanoke City Sch. Bd.,* 432 F.3d 294 (4th Cir.2005), for the proposition that S.W.'s injury based on the denial of a FAPE can no longer be redressed is misplaced. In *Emery,* the plaintiff's parents placed him in a private hospital after the school district failed to provide him with an IEP. However, the plaintiff incurred no expense for his education because his father's medical insurance paid the plaintiff's hospital bills. Years later, after the plaintiff was no longer a student, he brought suit under the IDEA to seek reimbursement for the hospital expenses. The Court of Appeals for the Fourth Circuit held that the plaintiff lacked standing. The court noted that the plaintiff had suffered an injury in that his school district had not provided him with an IEP for the 1992–1993 school year, but that this "core injury" was no longer redressable. *Id.* at 299. The court went on to conclude that the plaintiff had no subsidiary injury because, "[c]rucially for the purposes of standing, he suffered no out-of-pocket loss himself for the services that [the hospital] provided." *Id.*

The plaintiff's "core injury" in Emery was not redressable, however, because his father's insurance company had already paid his educational expenses in full. Therefore, as the court in *Emery* explained, awarding "reimbursement" to the plaintiff would not be paying for his education, but would be purely "a windfall." *Id.* at 299. In this case, payment of M.W.'s 2005–2006 tuition to Bay Ridge would not be a windfall because no one has yet paid for that year of his education. Because the denial of a FAPE to M.W. is still redressable in this case, S.W. has standing to bring this action.

**B.**

Although S.W. has standing to bring this claim, it is unnecessary to determine whether, under the IDEA, a parent who

cannot afford to pay the costs of her child's private school placement can seek retroactive tuition payment from the state directly to the private school because, as explained below, the Court finds that the equities do not warrant such an award in this case. Amici request this Court to declare that an IHO or a court may order a school district to make direct tuition payments retroactively to a private school in order to ensure that a disabled student receives a FAPE. They argue that the availability of a private school education when a school district has failed to provide a FAPE should not be limited to those families with sufficient resources to pay in advance for a private education. *Burlington* specifically authorized retroactive reimbursement to parents as an appropriate remedy where the parents correctly determined that the IEP was inappropriate and assumed the financial risk of placing their child in an appropriate private school. 471 U.S. at 370–71, 105 S.Ct. 1996. Some courts have, however, ordered school districts to make prospective tuition payments directly to a private school. *See, e.g., Draper v. Atlanta Indep. Sch. Sys.,* 518 F.3d 1275, 1284–86 (11th Cir.2008) (prospectively awarding plaintiff with placement in private school); *Sabatini v. Corning–Painted Post Area Sch. Dist.,* 78 F.Supp.2d 138 (W.D.N.Y.1999) (granting preliminary injunction requiring district to pay for private placement and instructing district to "make whatever financial arrangements are necessary" to allow student to attend private school); *see also Connors v. Mills,* 34 F.Supp.2d 795 (N.D.N.Y.1998) (noting in dicta that a dis-

trict court could order prospective payment directly to a private school if the parent showed that he or she was unable to front the cost of the private school). The parties have cited no case in which a court has ordered direct tuition payment to a private school on a retrospective basis. In a case where the equities favor such an award, there may be good reasons why direct tuition payment should be a remedy available to a needy parent, on either a prospective or retrospective basis. However, that is not this case.

### C.

■ The Supreme Court has established a two-part test to determine whether parents are entitled to reimbursement: (1) whether the IEP proposed by the school district was inappropriate, and (2) whether the private placement was appropriate to the child's needs.[3] *Gagliardo,* 489 F.3d at 111–12 (citing *Burlington,* 471 U.S. at 370, 105 S.Ct. 1996). The burden of persuasion rests with the party seeking relief, which in this case is the plaintiff. *See Schaffer v. Weast,* 546 U.S. 49, 56, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005). If parents carry their burden of showing that the IEP was deficient and that the private placement was appropriate, the Court has discretion to consider equitable factors relating to the reasonableness of the parents' action in fashioning relief. *A.C.,* 553 F.3d at 171; *see also Gagliardo,* 489 F.3d at 112 (citing *Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 16, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993)).

S.W. argues that the SRO's holding that the equities precluded an award of the cost

---

**3.** Although S.W. seeks retroactive direct tuition payment rather than retroactive reimbursement, the *Burlington* analysis would apply to her claim, assuming, that is, that the IDEA provides for direct tuition payment. In either case, relief would only be warranted if a court determined that the IEP was inappropriate and that the private placement was

proper. Because a court's authority to grant relief in IDEA cases derives from 20 U.S.C. § 1415(e)(2), which authorizes "such relief as the court determines is appropriate," equitable considerations would also be equally relevant in a direct payment case. *See Burlington,* 471 U.S. at 374, 105 S.Ct. 1996.

of tuition to Bay Ridge should be reversed for two reasons. First, S.W. argues that the SRO exceeded his jurisdiction by raising the notice requirement when the DOE had not made a notice argument in its petition at the state review level. Second, she argues that the notice requirement does not apply to students who are already enrolled in private school, because the relevant portion of the statute refers to giving ten days' notice "prior to the removal of the child from the public school." *See* 29 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb). Neither of these arguments are persuasive.

### 1.

■■■■ First, S.W. argues that the SRO improperly raised the notice issue when the parties had not made this argument in the course of the administrative review. The DOE asserts that it raised the issue of the notice requirement in its Verified Petition to the SRO. While the Verified Petition did not explicitly argue that tuition payment should be denied because S.W. failed to give timely notice to the DOE of her intention to enroll M.W. at Bay Ridge, the Verified Petition did raise the argument that the equities weighed against granting relief, and it specifically cited the timely notice requirement in 20 U.S.C. § 1412(a)(10)(C)(iii) as one of the relevant equitable considerations. (Verified Pet. ¶ 72.) Moreover, the Verified Petition also argued "that the equities bar tuition funding to Bay Ridge where the parent agreed in advance of the 2005–2006 SY to baselessly reject the DOE placement out of hand without giving the DOE the opportunity to provide FAPE to her son for the 2005–2006 SY." (Verified Pet. ¶ 12.) While couched as an argument based on S.W.'s lack of cooperation, the allegations also support a finding that S.W. failed to notify the DOE in a timely manner that would have allowed them to work with her to find an appropriate placement within the public school system. Indeed, the notice requirement serves the impor-

tant function of facilitating cooperation between parents and school districts by requiring parents to give the school system an opportunity to provide the student with a FAPE in public school before resorting to a private school placement. *See Greenland Sch. Dist. v. Amy N.*, 358 F.3d 150, 160 (1st Cir.2004); *Carmel Cent. Sch. Dist. v. V.P.*, 373 F.Supp.2d 402, 414 (S.D.N.Y. 2005).

This case is therefore not like the cases cited by S.W. in which the hearing officer improperly made a finding on an unrelated issue that had not been raised by the parties, or on an issue that had already been finally decided in the impartial hearing below and had not been appealed. *See, e.g., Metro. Bd. of Public Educ. v. Guest,* 193 F.3d 457, 463 (6th Cir.1999) (holding that district courts may not review an IEP in an administrative hearing when the parent has not challenged the IEP); *Hiller v. Bd. of Educ.*, 674 F.Supp. 73, 77 (N.D.N.Y.1987) (holding that the Commissioner violated the finality requirement of administrative decision by finding that student was not disabled, when the issue on appeal was whether the student's IEP was appropriate and the student's disabled status was uncontested). Here, the DOE squarely placed equitable considerations before the SRO, and the SRO appropriately relied on the notice requirement to reach his decision. *See J.S. v. North Colonie Cent. Sch. Dist.*, 586 F.Supp.2d 74, 86 (N.D.N.Y.2008) (holding that the IHO properly considered the issue of transition services in a challenge to a proposed IEP because transition services are a component of a FAPE). Moreover, the DOE's arguments about S.W.'s lack of cooperation also raised issues of timely notice, and the SRO properly considered them.

### 2.

S.W.'s argument that the notice requirement did not apply to her is also without

merit. First, she appears to have misread the SRO Decision to have applied only the notice requirement in 20 U.S.C. § 1412(a)(10)(C)(iii)(1)(bb).[4] However, the SRO applied both Subsections (aa) and (bb), concluding that S.W. had failed to notify the CSE at the June 2, 2005 CSE meeting that she would be rejecting the public school placement and enrolling M.W. at Bay Ridge, and that she did not provide written notice of that decision until January 12, 2006. (SRO Decision at 4.) However, Subsection (aa) also refers to the "removal of the child from the public school."

Nonetheless, S.W.'s argument still fails. While S.W. quotes language from various cases and the legislative history in support of her position that Subsections (aa) and (bb) apply only to students being removed from public school, these statements only pass upon the importance of notice before removing a child from public school. In none of these cases or excerpts from the legislative history is there any support for the proposition that notice is important only when a child is in public school, or that parents of students currently enrolled in private school are exempted from the notice requirements altogether.

As the Court of Appeals for the Second Circuit has noted, before the IDEA was amended in 1997 to include the notice requirements in subsections (aa) and (bb), courts "held uniformly that reimbursement is barred where parents unilaterally arrange for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP." *M.C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 68 (2d Cir.2000). In *M.C.*, the Court of Appeals held that the plaintiff was not entitled to reimbursement for the costs of private psychological counseling services which his parents sought without notifying the school board beforehand of their dissatisfaction with the plaintiff's IEP. *Id.* at 68–69. Notably, when the plaintiff began receiving counseling services, he had already been removed from the public school and was being home-schooled at that time. In discussing the notice requirements contained in subsections (aa) and (bb), the Court of Appeals noted that they appeared "to codify the previously recognized discretion of a court to reduce or bar reimbursement where parents fail to raise the appropriateness of an IEP in a timely manner."[5] *Id.* at 69 n. 9.

4. The relevant portion of the statute provides: "The cost of reimbursement described in clause (ii) may be reduced or denied—

(I) if—
(aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or
(bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give writ-

ten notice to the public agency of the information described in item (aa);
(II) if, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in section 1415(b)(3) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or
(III) upon a judicial finding of unreasonableness with respect to actions taken by the parents."
20 U.S.C. § 1412(a)(10)(C)(iii).

5. Subsections (aa) and (bb) did not apply to M.C.'s claim for reimbursement of his coun-

The reading advanced by S.W. would mean that parents of children who are enrolled in private schools at public expense, or who are otherwise not currently enrolled in a public school, have no obligation whatsoever to notify their local school district before unilaterally enrolling or re-enrolling their children in private school. This interpretation defeats the aim of the IDEA to provide children with a FAPE in public schools and would allow such parents to enroll or re-enroll their children in private schools without giving any consideration to a public school placement. *See W.S. ex rel.C.S. v. Rye City Sch. Dist.*, 454 F.Supp.2d 134, 148 (S.D.N.Y.2006) (noting that the IDEA views public school as "the preferred venue for educating the child" and "private school as a last resort"). This reading is plainly mistaken. *See Greenland*, 358 F.3d 150 (applying notice requirements where parents had re-enrolled child at private school); *see also Roark v. District of Columbia*, 460 F.Supp.2d 32, 41 & n. 9 (D.D.C.2006) (assuming without deciding that notice requirements applied to parents whose child was already enrolled in a private school at public expense and who removed the child to another private school).

A similar issue has arisen under 20 U.S.C. § 1412(a)(10)(c)(ii). That section permits reimbursement to parents of a child with a disability who has previously received a special education under the authority of a public agency, where the parents enroll the child in a private school without the consent of the public agency, if the court or hearing officer finds that the agency failed to make a FAPE available to the child. Judge McMahon considered and rejected the argument that a child who had been re-enrolled in private school

should be entitled to reimbursement even though the child's parents had never requested special educational services from a public agency. *See Carmel*, 373 F.Supp.2d at 410–15. Reasoning that the re-enrollment of the child in her private school constituted the removal of the child from public school, the court held that the parents' failure to give notice to the school district that their child's special education was at issue, and to give the district an opportunity to provide a FAPE, was fatal to their reimbursement claim. *Id.* at 414.

 Similarly, in this case, the Court concludes that the statute applied to M.W. who was receiving special education services in a private school, paid for with public funds, such that S.W. was required to provide adequate notice to the school district so that it could be given the opportunity to devise a FAPE. The notice requirements applied to the plaintiff, and the SRO properly concluded that S.W.'s failure to comply with them justified denying her relief. In any event, under 20 U.S.C. § 1412(a)(10)(C)(iii), it remains within the discretion of the Court to reduce or deny reimbursement "upon a judicial finding of unreasonableness with respect to actions taken by the parents," a subject to which the Court now turns.

### 3.

S.W. does not attempt to refute the DOE's arguments that her delay in providing notice and her failure to cooperate were equitable factors weighing against an award of direct tuition payment. Rather, she argues only that the DOE violated the IDEA by failing to reevaluate M.W. and by failing to offer an appropriate placement at the CSE meeting, and that the SRO erred by not considering these coun-

seling expenses because those services were provided and paid for before June 4, 1997, the effective date of the amendments.

tervailing factors and denying tuition payment entirely.

While it is true that the DOE did not reevaluate M.W. after the June 2, 2005 CSE meeting, there is nothing in the record that indicates that S.W. requested a reevaluation. Moreover, nothing about the DOE's failure to reevaluate M.W. explains why S.W. did not provide timely notice to the DOE or cooperate with the DOE's efforts to provide M.W. with a FAPE in a public school. Lastly, the fact that the DOE failed to provide an adequate FAPE is a fact common to all due process challenges that meet the first prong of *Burlington;* it is not an independent factor that should be considered when weighing the equities.

The Court is therefore left with the facts that S.W. did not inform the CSE that she was rejecting the public school placement and enrolling M.W. at Bay Ridge, that she signed an enrollment contract agreeing to reject the public school placement two months before even visiting the proposed public school, and that she did not give written notice of her decision to the DOE until seven months after the CSE meeting, four months after M.W. began the 2005–2006 school year at Bay Ridge, and three months after visiting the public school placement. These actions evince unreasonable delay and the lack of a good faith effort to cooperate with the DOE to find an appropriate public school placement for her son, and they warrant the denial of direct tuition payment here. *See M.C.,* 226 F.3d at 68–69; *Bettinger v. New York City Bd. of Educ.,* No. 06 Civ. 6889, 2007 WL 4208560, at *9 (S.D.N.Y. Nov. 20, 2007) (holding that equitable considerations did not favor parents' claim where they failed to cooperate with the district's efforts to place their son); *Carmel,* 373 F.Supp.2d at 415 (denying tuition reimbursement to parents where parents did not give notice to the CSE until after

re-enrolling their child in private school and where facts indicated that parents never seriously considered public school placement). Summary judgment in favor of the DOE is therefore granted.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. For the reasons discussed above, the DOE's motion for summary judgment (Docket No. 13) is **granted** and S.W.'s motion for summary judgment (Docket No. 22) is **denied.** The amicus organizations's motion for leave to file a memorandum of law *amicus curiae* (Docket No. 16) is **granted.** The Clerk of the Court is directed to enter judgment for the DOE and to close this case.

**SO ORDERED.**